[L.A. No. 31826. May 2, 1985.]

TECH-BILT, INC., Cross-complainant and Appellant, v.
WOODWARD-CLYDE & ASSOCIATES,
Cross-defendant and Respondent.

COUNSEL

Gibson & Kennerson and Paul R. Kennerson for Cross-complainant and Appellant.

Eric N. Winter as Amicus Curiae on behalf of Cross-complainant and Appellant.

Daley & Heft and Dennis W. Daley for Cross-defendant and Respondent.

Leonard Sacks, Robert E. Cartwright, Victoria J. De Goff, Wylie A. Aitken, Harlan Arnold, Glen T. Bashore, Ray Bourhis, Richard D. Bridgman, Edwin Train Caldwell, David S. Casey, Jr., Douglas K. deVries, H. Greig Fowler, Sanford M. Gage, Ian Herzog, G. Dana Hobart, Stanley K. Jacobs, Harvey R. Levine, John C. McCarthy, Timothy W. Peach, Joseph Posner, Robert H. Sulnick, John M. Van Dyke, Arne Werchick, Stephen I. Zetterberg and Anderson, McPharlin & Conners as Amici Curiae on behalf of Cross-defendant and Respondent.

OPINION

**GRODIN, J.**—This case requires us to consider the meaning of the phrase "settlement . . . made in good faith" as used in Code of Civil Procedure section 877.6,[1] and to determine whether a plaintiff's decision to dismiss a claim barred by the statute of limitations in return for a waiver of costs is sufficient to insulate the dismissed tortfeasor/defendant against claims in equitable indemnity asserted by a nonsettling codefendant.

I.

Tech-Bilt, Inc. (Tech-Bilt) appeals from a judgment which granted a motion for summary judgment and dismissed its cross-complaint against Woodward-Clyde & Associates (Woodward-Clyde). Plaintiffs in the underlying action, Mr. and Mrs. Andrew Fabula (hereinafter referred to as the plaintiffs), owners of a residential property, brought this action against Tech-Bilt (the developer), Woodward-Clyde (soils engineers), and others on various theories to recover damages for structural defects in their residence.

During informal discovery in the early stages of litigation, counsel for Woodward-Clyde informed counsel for plaintiffs that Woodward-Clyde had completed its services on the subject development more than 10 years before plaintiffs filed their complaint in this action. Plaintiffs' action against Woodward-Clyde was therefore barred by the applicable 10-year statute of limi-

---

[1]All statutory references, unless otherwise noted, are to the Code of Civil Procedure.

tations under section 337.15. Woodward-Clyde's counsel expressed his intention to file a motion for summary judgment based on this statute of limitations, but also offered plaintiffs an alternative. If plaintiffs agreed to dismiss their claim against Woodward-Clyde with prejudice, Woodward-Clyde would waive any claim against plaintiffs for costs incurred in defending the action.[2] Plaintiffs agreed to this proposal and dismissed their claim against Woodward-Clyde in March 1981.

In April 1981, Tech-Bilt filed an amended cross-complaint for indemnity and declaratory relief, and in June named Woodward-Clyde as a party cross-defendant. Woodward-Clyde then brought motions for an order to confirm its agreement with the plaintiffs as a good faith settlement under the terms of section 877.6 and for summary judgment as to Tech-Bilt's cross-complaint. After a hearing, the court found the settlement to be in good faith and entered summary judgment dismissing Tech-Bilt's cross-complaint against Woodward-Clyde. Tech-Bilt appeals, arguing that the agreement between Woodward-Clyde and plaintiffs is not a settlement in good faith within the meaning of section 877.6 and should not, therefore, bar Tech-Bilt's claim for indemnity against Woodward-Clyde.

As a preliminary matter, it should be noted that, had Woodward-Clyde obtained a summary judgment on plaintiffs' claim on the basis of section 337.15, this would not have barred Tech-Bilt's cross-complaint against Woodward-Clyde for equitable indemnity. "[A] cross-complaint for indemnity may be filed more than 10 years after the alleged indemnitor has substantially completed his services, provided that the underlying action was itself brought within the 10-year limitation period of the statute." (*Valley Circle Estates* v. *VTN Consolidated, Inc.* (1983) 33 Cal.3d 604, 609 [189 Cal.Rptr. 871, 659 P.2d 1160].) In this case, plaintiffs' action against Tech-Bilt was brought within the 10-year limitation period of section 337.15. The question presented is thus whether Tech-Bilt's right to cross-complain for equitable indemnity is substantially affected by the fact that plaintiffs' underlying action against Woodward-Clyde was terminated by a dismissal in return for waiver of costs rather than through a summary judgment motion.

## II.

The statutes which govern this case are sections 877 and 877.6. Section 877 provides: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort— [¶] (a) It shall not discharge any other such

---

[2] Woodward-Clyde's costs evidently amounted to $55 for an answer fee.

tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and [¶] (b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors."

Section 877.6 states, in pertinent part: "(a) Any party to an action wherein it is alleged that two or more parties are joint tortfeasors shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors . . . . [¶] (c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault. [¶] (d) The party asserting the lack of good faith shall have the burden of proof on that issue."

To fully appreciate the meaning of section 877.6 a brief review of the legislative and decisional history preceding its enactment is appropriate. At common law, there was no right of contribution among tortfeasors. "The ancient basis of the rigid rule against contribution in this type of case is the policy that the law should deny assistance to tortfeasors in adjusting losses among themselves because they are wrongdoers and the law should not aid wrongdoers." (Fourth Progress Rep. to the Legis. by the Sen. Interim Com. on Judiciary, p. 130, 1 Appen. to Sen. J. (1957 Reg. Sess.) [hereafter Jud. Com. Rep.].)

At the same time, the common law provided a powerful disincentive to settlements between plaintiffs and individual tortfeasors in a multiple defendant action since the plaintiff's release or dismissal of one joint tortfeasor for consideration released all the others. The theory behind this rule was that there could be only one compensation for a joint wrong and since each joint tortfeasor was responsible for the whole damage, payment by any one of them satisfied plaintiff's claim against all. Whether this rule applied also to concurrent tortfeasors was open to question. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 38, pp. 2336-2337.)

California's tort contribution legislation (pt. 2, tit. 11, in which §§ 877 & 877.6 now appear) was sponsored by the State Bar and originally introduced in 1955 as Senate Bill No. 412. The primary purpose of the bill was

the equitable objective of ameliorating the punitive effect of the no-contribution rule upon joint tortfeasors.[3]

It is significant that, as originally proposed, the bill did not address the effect of a release or a covenant not to sue given to one of several joint tortfeasors. Section 877, providing for such settlements, was added to the bill at the suggestion of the Senate Committee on Judiciary. (Jud. Com. Rep., *op. cit. supra,* at p. 129.) Title 11 was ultimately enacted in 1957. (Stats. 1957, ch. 1700, § 1, p. 3076.)

**(1)** As the Court of Appeal in *River Garden Farms, Inc.* v. *Superior Court* observed, "[t]he major goals of the 1957 tort contribution legislation are, first, equitable sharing of costs among the parties at fault, and second, encouragement of settlements." (*River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986, 993 [103 Cal.Rptr. 498] [hereafter *River Garden Farms*].)

In interpreting this legislation, the courts therefore properly attempted to accommodate both objectives, even though the goals of equitable sharing and encouragement of settlements are not always necessarily harmonious. "[I]f the policy of encouraging settlements is permitted to overwhelm equitable financial sharing, the possibilities of unfair tactics are multiplied. Neither statutory goal should be applied to defeat the other." (*Id.,* at p. 998.)

The good faith provision of section 877 mandates that the courts review agreements purportedly made under its aegis to insure that such settlements appropriately balance the contribution statute's dual objectives.[4] "Lack of good faith encompasses many kinds of behavior. It may characterize one or both sides to a settlement. When profit is involved, the ingenuity of man

---

[3]The State Bar explanation accompanying the bill, which was adopted by the Senate Committee on Judiciary, read in pertinent part: "Under the common law there is no contribution between joint tortfeasors. One of several joint tortfeasors may be forced to pay the whole claim for the damages caused by them yet he may not recover from the others their pro rata share of the claim. California follows this rule. [Citations.] *The purpose of this bill is to lessen the harshness of that doctrine.*" (Jud. Com. Rep., *op. cit. supra,* at p. 130, italics added.)

[4]As originally introduced, the bill (Sen. Bill No. 1510 (1957 Reg. Sess.)) did not include a good faith provision. The phrase was inserted into section 877 by a committee amendment during the legislative session. (3 Assem. J. (1957 Reg. Sess.) p. 4716.) As noted by the court in *River Garden Farms,* California's statute, as amended, substantially parallels the language of section 4 of the proposed Uniform Contribution Among Tortfeasors Act as revised in 1955. The commissioners' comment to section 4 clearly indicates that the good faith language was added to give the courts occasion to review settlements between a plaintiff and one of several tortfeasors to determine whether they prejudiced the interests of a non-settling tortfeasor. (See *id.,* at pp. 995-996.)

spawns limitless varieties of unfairness. Thus, formulation of a precise definition of good faith is neither possible nor practicable. The Legislature has here incorporated by reference the general equitable principle of contribution law which frowns on unfair settlements, *including those which are so poorly related to the value of the case as to impose a potentially disproportionate cost on the defendant ultimately selected for suit.*" (*Id.*, at p. 997, italics added.)

By their terms, the tort contribution statutes applied only to tortfeasors against whom a money judgment had been jointly rendered. (§ 875, subd. (a).) In *American Motorcycle Assn. v. Superior Court,* however, we articulated a related remedial theory of partial indemnity which is broadly applicable to all multiple tortfeasors. (*American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] [hereafter *American Motorcycle*].)

Our primary concern in *American Motorcycle* was the equitable objective of allocating the cost of loss appropriately among multiple tortfeasors. "[I]n the great majority of cases . . . equity and fairness call for an apportionment of loss between the wrongdoers in proportion to their relative culpability, rather than the imposition of the entire loss upon one or the other tortfeasor." (*Id.*, at p. 595.) Thus, "to attain . . . a system, in which liability for an indivisible injury caused by concurrent tortfeasors will be borne by each individual tortfeasor 'in direct proportion to [his] respective fault,' . . . the current equitable indemnity rule should be modified to permit a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis." (*Id.*, at p. 598.)

"The legislative history of the 1957 contribution statute quite clearly demonstrates that the purpose of the legislation was simply 'to lessen the harshness' of the then prevailing common law no contribution rule. Nothing in the legislative history suggests that the Legislature intended by the enactment to preempt the field or to foreclose future judicial developments which further the act's principal purpose of ameliorating the harshness and inequity of the old no contribution rule." (*Id.*, at p. 601, fn. omitted.)

In addition, we noted that the 1957 legislation contains a specific provision which explicitly mandates that the "right of contribution shall be administered in accordance with the principles of equity." (§ 875, subd. (b).) In *American Motorcycle,* several amici argued that we should decline to adopt the partial indemnity doctrine because it would assertedly undermine the public policy in favor of encouraging settlement of litigation embodied in section 877. To this concern, we responded that section 877 should also

apply to discharge a settling tortfeasor from claims for partial or comparative indemnity.

Nothing in our discussion on this point, however, suggested a departure from the interpretation of section 877 offered in *River Garden Farms*. In fact, we cited *River Garden Farms* to explicate the meaning of the phrase "'good faith' settlement" under section 877. (*American Motorcycle*, 20 Cal.3d at p. 604.)[5]

The Legislature responded to *American Motorcycle* in 1980 by its enactment of section 877.6. That section codifies the *American Motorcycle* result by providing that a section 877 settlement bars claims for partial or comparative indemnity as well as for contribution. (§ 877.6, subd. (c).) It also specifically reiterates the proviso that a settlement must be made in good faith before it will operate as a bar and clarifies the procedures for judicial determination of the good faith issue.

This background strongly suggests that the Legislature intended the term "good faith" in section 877.6 to bear the meaning ascribed to that term in section 877 by the Court of Appeal's decision in *River Garden Farms* and by this court in *American Motorcycle*.

The United States Court of Appeals for the Ninth Circuit, applying California law, reached that conclusion in *Commercial U. Ins. Co. v. Ford Motor Co.* (9th Cir. 1981) 640 F.2d 210. Plaintiff in that case, complaining of injuries allegedly caused by a defective Ford automobile, dismissed Ford Motor Company as a defendant for tactical reasons (he wished to avoid their expert witnesses) and proceeded against the retail dealer alone. Ford evidently offered no consideration for this "settlement." Citing *River Garden Farms* and *American Motorcycle,* the court concluded that "the expansion of § 877 to prevent a party from seeking indemnification from another should apply only when the policy of settlement has been furthered and a settlement is made in good faith. [¶] In determining whether the policy of settlement has been furthered, we look to the conduct of the parties. When a plaintiff dismisses an action, the policy is furthered only when the dismissal resulted from a mutual decision to settle the dispute. At that stage of the inquiry, the testimony of counsel recounting the basis for dismissal is relevant. [¶] Section 877 applies to settlement [*sic*] made in good faith only. Individuals not participating in the settlement are barred from seeking con-

---

[5]"[T]he legislative policy underlying . . . [section 877] dictates that a tortfeasor who has entered into a 'good faith' settlement (see *River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d 986) with the plaintiff must also be discharged from any claim for partial or comparative indemnity that may be pressed by a concurrent tortfeasor." (*Id.,* at p. 604.)

tribution only if the settling parties acted in good faith with respect to them. Hence, good faith of the dismissal alone is not sufficient. The dismissal must represent a settlement which is a good faith determination of relative liabilities. Only in this situation are both policies behind § 877—equity and settlement—furthered." (640 F.2d at p. 213.)

Applying this standard to the case before it, the court observed that "[t]he record reveals that the decision to dismiss was substantially a tactical maneuver by plaintiff's attorneys. It does not reflect the cooperative decision-making between parties which is the earmark of settlement. Nor does it reflect a consideration of relative liability. This case involves $3,250,000 in damages. Even a slight probability of liability on Ford's part would warrant significant contribution. There was at least one expert prepared to testify that there was a design defect. [¶] Moreover, a settlement, to the extent that it is dictated by the tactical advantage of removing a deep-pocket defendant because of the experts it could produce and the skilled trial attorneys it could retain, is not made in 'good faith' consideration of the relevant liability of all parties. Accordingly, the court erred in finding that the settlement absolving Ford of any liability to Meyers was made in good faith." (640 F.2d at pp. 213-214.)[6]

A competing interpretation of the "good faith" requirement was suggested by the Court of Appeal in *Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798 [173 Cal.Rptr. 38]. Plaintiff in that case, complaining of injuries from an automobile accident, sued two defendants, Dompeling and Chatom, who in turn each cross-complained against the other for partial indemnity. Plaintiff settled with Dompeling for $100,000, the limit of his insurance policy, and Chatom challenged the settlement as being in bad faith. The question before the Court of Appeal was whether Chatom should be permitted to depose Dompeling as to his personal and business assets in order to demonstrate that the plaintiff's prospective recovery against Dompeling was in excess of the settlement amount. In rejecting Chatom's claim, the court reasoned: "Bad faith is not established by a showing that a settling defendant paid less than his theoretical proportionate or fair share of the value of plaintiff's case. . . . [¶] Where plaintiff settles with fewer than all defendants, the defendants are clearly adverse parties. A settling defendant does not owe a legal duty to adverse parties, the nonsettling defendants, to pay the plaintiff more so that the adverse parties may pay the plaintiff less. Plaintiff and defendants are also adverse parties; the plaintiff does not owe a legal duty to the nonsettling defendants to seek more from a settling de-

---

[6]In a more recent case the Ninth Circuit, noting the conflict between the approach taken in *Commercial U. Ins. Co.* and that taken by the California Court of Appeal in subsequent cases (*post*, pp. 497-499) adhered to its view in *Commercial U. Ins. Co.*, predicting that this court would do the same. (*Owen* v. *United States* (9th Cir. 1983) 713 F.2d 1461, 1465.)

fendant so that the nonsettling defendants may pay less. [¶] *The settling parties owe the nonsettling defendants a legal duty to refrain from tortious or other wrongful conduct; absent conduct violative of such duty, the settling parties may act to further their respective interests without regard to the effect of their settlement upon other defendants.*" (*Id.*, at pp. 809-810, italics added.)

But the *Dompeling* every-person-for-himself approach is capable of producing harsh results, as the Fifth District Court of Appeal which decided *Dompeling* soon recognized. In *Cardio Systems, Inc.* v. *Superior Court* (1981) 122 Cal.App.3d 880 [176 Cal.Rptr. 254], plaintiffs filed an action in medical malpractice and products liability after their decedent died on the operating table, allegedly as a result of incorrect use of a heart-lung machine. Prior to trial, plaintiffs dismissed the action against Cardio, the machine's distributor, in return for a waiver of costs. Plaintiffs' attorney testified that the decision to dismiss was a tactical one: " 'I had no desire . . . to complicate a clear liability, relatively simple medical malpractice case by bringing in a products case. . . .' " (*Id.*, at pp. 884-885.)

Though the Court of Appeal ruled that this dismissal was a good faith settlement under the terms of section 877, and therefore barred claims for equitable partial indemnity by other defendant tortfeasors, the court noted that this outcome was inequitable. "The result is unsatisfactory. The rule permits a plaintiff to insulate a defendant (Cardio) from being liable to a codefendant (Hospital) for comparative indemnity by dismissing against Cardio in consideration of a waiver of costs where the dismissal is motivated by plaintiffs' tactical considerations having little relationship to the potential liability of Cardio. The facts show that plaintiffs' counsel was of the opinion that plaintiffs had a fairly good liability case against Cardio and the reason for the dismissal against Cardio, according to the testimony of plaintiffs' counsel, was to avoid complicating plaintiffs' 'clear liability, relatively simple medical malpractice case' against Hospital. *The result is fundamentally unfair, and cannot be what the Legislature intended.*" (122 Cal.App.3d at pp. 890-891, italics added.) Nonetheless the court felt obliged to follow the definition of good faith which it had earlier articulated in *Dompeling.*

That the Legislature intended the term "good faith" in section 877.6 to have the narrow meaning ascribed by the *Dompeling* approach—i.e., the absence of tortious conduct—seems highly improbable, in light of the fact that the section represents a codification of our opinion in *American Motorcycle.* In that opinion, as we have already observed (*ante,* p. 496), we made specific reference to *River Garden Farms* in connection with the term "good faith." Moreover, the equitable policies expressed in *American Motorcycle,* and implicitly adopted by the Legislature, include both the encouragement

of settlements and the equitable allocation of costs among multiple tortfeasors. Those policies would be disserved by an approach which emphasizes one to the virtual exclusion of the other. (See Roberts, *The "Good Faith" Settlement: An Accommodation of Competing Goals* (1984) 17 Loyola L.A. L.Rev. 841, 899 et seq.)

██ A more appropriate definition of "good faith," in keeping with the policies of *American Motorcycle* and the statute, would enable the trial court to inquire, among other things, whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries. ██ This is not to say that bad faith is "established by a showing that a settling defendant paid less than his theoretical proportionate or fair share." (Cf. *Dompeling, supra,* 117 Cal.App.3d at p. 809.) Such a rule would unduly discourage settlements. "For the damages are often speculative, and the probability of legal liability therefor is often uncertain or remote. And even where the claimant's damages are obviously great, and the liability therefor certain, a disproportionately low settlement figure is often reasonable in the case of a relatively insolvent, and uninsured, or underinsured, joint tortfeasor." (*Stambaugh* v. *Superior Court* (1976) 62 Cal.App.3d 231, 238 [132 Cal.Rptr. 843].) Moreover, such a rule would tend to convert the pretrial settlement approval procedure into a full-scale minitrial (cf. *Dompeling, supra,* 117 Cal.App.3d at p. 810).

██ But these considerations do not lead to the conclusion that the amount of the settlement is irrelevant in determining good faith. Rather, the intent and policies underlying section 877.6 require that a number of factors be taken into account including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants. (See *In re MGM Grand Hotel Fire Litigation* (D.Nev. 1983) 570 F.Supp. 913, 927.) Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement. "[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be." (*Torres* v. *Union Pacific R.R. Co.* (1984) 157 Cal.App.3d 499, 509 [203 Cal.Rptr. 825].) The party asserting the lack of good faith, who has the burden of proof on that issue (§ 877.6, subd. (d)), should be permitted to demonstrate, if he can, that the settlement is so far "out of the ballpark"

in relation to these factors as to be inconsistent with the equitable objectives of the statute. Such a demonstration would establish that the proposed settlement was not a "settlement made in good faith" within the terms of section 877.6.[7]

We doubt that such an approach will be detrimental to the settlement process, though ultimately that is a judgment that should be made on the basis of experience rather than speculation. The plaintiff, of course, will have at least the same incentive to settle as under the nontortious conduct rule; indeed, to the extent that the settling defendant is induced to offer more in order to bring the settlement within the bounds of fairness, the plaintiff's incentive to settle may be greater. Since the "reasonable range" test which we adopt leaves substantial latitude to the parties and to the discretion of the trial court, defendants will still have an incentive to get out of the litigation for a reduced amount. (See Roberts, *The "Good Faith" Settlement: An Accommodation of Competing Goals, supra,* 17 Loyola L.A. L.Rev. 841, 928-929.) Moreover, from the standpoint of the public interest and the legal process, a prime value in encouraging settlement lies in "remov[ing] [the case] from the judicial system, and this occurs only when *all* claims relating to the loss are settled." (*Id.,* at pp. 888-889, italics added; see also Fleming, *Report to the Joint Committee of the California Legislature on Tort Liability on the Problems Associated With American Motorcycle v. Superior Court* (1979) 30 Hastings L.J. 1464, 1495; Note, *Settlement in Joint Tort Cases* (1966) 18 Stan.L.Rev. 486, 489.)[8]

Nor should this approach unduly burden the parties or the trial court. Section 877.6 contemplates that the determination of good faith may be made by the court on the basis of affidavits (subd. (b)), and as the court observed in *River Garden Farms,* "The price levels are not as unpredictable as one might suppose. Despite the uncertainties, generalized valuation criteria are recognized by the personal injury bar, insurance claims departments and pretrial settlement courts. When testing the good faith of a settlement figure, a court may enlist the guidance of the judge's personal experience and of experts in the field. Represented by knowledgeable counsel, settlement negotiators can predict with some assurance whether a settlement is within the reasonable range permitted by the criterion of good faith. The

---

[7]We disapprove of *Dompeling* and its progeny, including *Cardio Systems, supra,* and *Burlington Northern R.R. Co.* v. *Superior Court* (1982) 137 Cal.App.3d 942 [187 Cal.Rptr. 376], to the extent that those cases are inconsistent with this opinion.

[8]With all respect for the views of our dissenting colleague, we perceive no practical problem with respect to the finality of settlements. Under the procedure prescribed by section 877.6, the good faith of a settlement will be determined before trial. In the event (which we assume will be quite rare) that the trial court rejects the settlement as not being in good faith, the parties will have opportunity to renegotiate in light of this ruling. The situation is not unlike others in which settlements must be approved. (E.g., Prob. Code, § 3500.)

danger that a low settlement violates the good faith clause will not impart uncertainty so long as the parties behave fairly and the courts maintain a realistic awareness of settlement imponderables." (26 Cal.App.3d at p. 998, fn. omitted.)[9]

Several recent Court of Appeal opinions, while paying verbal service to *Dompeling,* have in fact engaged in such an analysis. In *Kohn* v. *Superior Court* (1983) 142 Cal.App.3d 323, 328 [191 Cal.Rptr. 78], the Court of Appeal quoted from *Dompeling* with approval, but held that the trial court "was within its discretion in finding the settlement to be in good faith" since "[a]lthough the sums paid may be grossly disproportionate to the sums prayed for in the complaint, they are not out of proportion to what the trial court might have considered the probable recovery of plaintiffs should they prove their case."

In *Widson* v. *International Harvester Co.* (1984) 153 Cal.App.3d 45 [200 Cal.Rptr. 136], a plaintiff settled with a joint tortfeasor, Louetto, against whom his cause of action had been tolled by the statute of limitations, as here, but received in return the sum of $30,000. In affirming the trial court's decision that the settlement was in good faith within the meaning of section 877.6, the court found: "Substantial evidence supports the trial court's determination the amount of the settlement is in fact fair. Evaluations of Louetto's potential liability ranged from zero to 10 percent of plaintiff's recovery. Counsel for Louetto expressed the view that in the worst case Louetto's exposure would tally 25 percent. Evaluations of plaintiff's total recovery ranged from $200,000 to $750,000. In such a factual context, it cannot be said the $30,000 paid by Louetto was unreasonable." (*Id.,* at p. 58; see also *Wysong & Miles Co.* v. *Western Industrial Movers* (1983) 143 Cal.App.3d 278, 290 [191 Cal.Rptr. 671]; Roberts, *The "Good Faith" Settlement: An Accommodation of Competing Goals, supra,* 17 Loyola L.A. L.Rev. 841, 924-928.)

■ In this case, by contrast, plaintiffs received nothing in return for the dismissal of their action against Woodward-Clyde except relief from having to pay Woodward-Clyde's costs because they were wrongfully sued. The same net situation would have existed if, mindful of the running of the statute of limitations against them, plaintiffs had not sued Woodward-Clyde in the first place. To say that section 877.6 cloaks Woodward-Clyde with immunity from liability to joint tortfeasors under these circumstances would

---

[9]The dissent is correct in observing that the inquiry contemplated by our opinion will extend of necessity beyond a simple determination of pro rata fair share. Indeed, it is precisely for that reason that we emphasize the broad parameters of the "ballpark" within which settlements will be deemed to be in good faith.

not serve the goal of encouraging settlement, and it would frustrate the goal of allocating costs equitably among multiple tortfeasors.

Ordinarily, a determination as to whether a settlement is in good faith must be left to the discretion of the trial court. In this case, however, the exercise of discretion on the basis of the criteria we have identified as appropriate could yield but one conclusion: this was not a settlement in good faith within the meaning of section 877.6.

The judgment is reversed.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Lucas, J., concurred.

**BIRD, C. J.**—I respectfully dissent.

The new rule adopted by the majority will require trial courts to apply an unworkable standard to every settlement. It will clog our trial courts with unnecessary hearings, discourage the settlement of legitimate claims, and severely strain the resources of the parties and the trial and appellate courts of this state.

The majority hold that in determining whether a settlement was made in good faith within the meaning of Code of Civil Procedure section 877.6,[1] the trial court must inquire "whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." (Maj. opn., *ante,* at p. 499.)

Such a rule will not only discourage settlements, but will place an intolerable burden on our trial courts. Moreover, the Legislature never intended to impose a legal duty upon settling parties to protect the interests of adverse parties at the expense of their own mutual benefit. In accordance with a long line of California appellate court decisions, I would hold that a settlement satisfies the good faith requirement if it is free of corrupt intent, i.e., free of intent to injure the interests of the nonsettling tortfeasors. A settlement is made in bad faith only if it is collusive, fraudulent, dishonest, or involves tortious conduct. (See, e.g., *Ford Motor Co.* v. *Schultz* (1983) 147 Cal.App.3d 941, 950 [195 Cal.Rptr. 470]; *Burlington Northern R.R. Co.* v. *Superior Court* (1982) 137 Cal.App.3d 942, 945-946 [187 Cal.Rptr. 376]; *Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798, 809-810 [173 Cal.Rptr. 38].)

The majority's proportionate liability test of good faith originated in *River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986 [103

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise indicated.

Cal.Rptr. 498]. Although *River Garden Farms* discusses the "danger that a low settlement violates the good faith clause" (*id.*, at p. 998), that discussion is mere dictum. *River Garden Farms* did *not* involve settlements that were inordinately low, but settlements that were allegedly unfairly allocated among the plaintiffs' claims. "*River Garden Farms* did not involve the usual objection that the settlement entered into was too low and, therefore, should not be determined to be in 'good faith.' The charge of lack of 'good faith' was aimed at the plaintiff [*sic*] alone, and was based upon the plaintiff's [*sic*] allocation of certain settlement proceeds among various claims so as to increase the potential liability of the nonsettling defendant, River Garden Farms." (Roberts, *The "Good Faith" Settlement: An Accommodation of Competing Goals* (1984) 17 Loyola L.A. L.Rev. 841, 855; see also *River Garden Farms, supra,* 26 Cal.App.3d at p. 992.)

The court in *River Garden Farms* purported to base its interpretation of the good faith clause upon the legislative history of section 877. (*Id.*, at p. 995.) However, there is nothing in the legislative history of section 877 to indicate the meaning to be given to the clause. Therefore, the court in *River Garden Farms* speculated that section 877 was based upon section 4 of the proposed Uniform Contribution Among Tortfeasors Act as revised in 1955.[2] (*Id.*, at pp. 995-996.)

The commissioners' notes to section 4 explained that the purpose of the good faith clause was a narrow one. The clause was intended only to give the court "occasion to determine whether the transaction was collusive . . . ." (12 Uniform Laws Annot. (Master ed. 1975) p. 99.) However, the court in *River Garden Farms* contended that the good faith requirement was designed to prohibit "many kinds of behavior" other than collusive conduct "aimed to injure the interests of an absent tortfeasor." (*River Garden Farms, supra,* 26 Cal.App.3d at pp. 996, 997.) The court cited no authority for this conclusion, but suggested that section 4 was revised to include the good faith clause because the " 'plaintiff should not be permitted to release one tortfeasor from his fair share of liability and mulct another instead, from motives [of] sympathy or spite, or because it might be easier to collect from one than from the other. . . .' " (*Id.*, at pp. 995-996; 12 Uniform Laws Annot. (Master ed. 1975) p. 99, comrs. com. to § 4.)

---

[2]Section 4 provides as follows: "When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death: [¶] (a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and, [¶] (b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor."

While the above-quoted passage appears in the comments to section 4 of the 1955 revision of the uniform act, it actually refers to the rationale behind section 5 of the 1939 version of the act. Section 5 provided that a settling tortfeasor was not released from liability unless the release provided that plaintiff's ultimate recovery would be reduced to the extent of the released tortfeasor's pro rata share of the damages.

The commissioners noted that "[r]eports from the state where the Act is adopted appear to agree that [section 5] has accomplished nothing in preventing collusion." (*Ibid.*) Moreover, its effect "has been to discourage settlements in joint tort cases, by making it impossible for one tortfeasor alone to take a release and close the file. Plaintiff's attorneys are said to refuse to accept any release which contains the provision reducing the damages . . . because they have no way of knowing what they are giving up." (*Ibid.*)

Therefore, in 1955 the commissioners abandoned section 5 of the uniform act in favor of permitting release from contribution where the settlement is made in good faith. "It seems more important not to discourage settlements than to make an attempt of doubtful effectiveness to prevent discrimination by plaintiffs, or collusion in the suit. Accordingly [section 4(b)] provides that the release in good faith discharges the tortfeasor outright from all liability for contribution." (*Id.*, at p. 100.) Thus, contrary to *River Garden Farms'* broad interpretation of the good faith clause, the 1955 revisions to the uniform act represented a policy decision to encourage settlement. The commissioners abandoned as unworkable their earlier attempt to protect nonsettling parties from inequity other than that caused by collusive conduct.

The court in *River Garden Farms* also based its "fair share" good faith test on an analogy to contract law. The court relied upon insurance cases holding that the implied covenant of good faith and fair dealing in an insurance contract requires the insurer to consider the insured's interests in deciding whether to settle. (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 430 [58 Cal.Rptr. 13, 426 P.2d 173]; *Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 793-794 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142]; see *River Garden Farms, supra,* 26 Cal.App.3d at p. 997.) "The carrier's duty of good faith extends beyond fraud or dishonesty and encompasses any kind of unfair dealing." (*Ibid.*)

The obvious flaw in this analogy is that the relationship between the settling parties and the nonsettling parties is not contractual. Their relationship is simply not comparable to the fiduciary relationship between an insurance carrier and the insured who has contracted for the carrier's protection. In

fact, the settling parties and the nonsettlors are adverse parties. (*Dompeling* v. *Superior Court, supra,* 117 Cal.App.3d at p. 809.)

Absent a contractual or other special relationship, the settling parties do not have a duty to protect the interests of the nonsettling tortfeasors. They have a duty only to settle in good faith, i.e., with " 'honest, lawful intent' " (*People* v. *Nunn* (1956) 46 Cal.2d 460, 468 [296 P.2d 813]). " 'As understood in law the phrase "in good faith" has a settled and well-defined meaning, which generally imports that in any given case the transaction involved was honestly conceived and consummated without collusion, fraud, or knowledge of fraud, and without intent to assist in a fraudulent or otherwise unlawful design.' " (*Appel* v. *Morford* (1943) 62 Cal.App.2d 36, 40 [144 P.2d 95].)

I agree with the court in *Dompeling* that "[t]he settling parties owe the nonsettling defendants a legal duty to refrain from tortious or other wrongful conduct; absent conduct violative of such duty, the settling parties may act to further their respective interests without regard to the effect of their settlement upon other defendants." (*Dompeling* v. *Superior Court, supra,* 117 Cal.App.3d at pp. 809-810, fn. omitted.)

The persuasiveness of *River Garden Farms* is also undermined by the fact that in 1972, when the case was decided, contribution applied only among joint judgment debtors to the extent of each debtor's pro rata share of the judgment. (See § 875, subds. (a) & (c).) This court has since adopted the partial indemnity rule permitting a tortfeasor to seek indemnity from all joint tortfeasors to the extent of their comparative fault. (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 583, 604 [146 Cal.Rptr. 182, 578 P.2d 899].) Therefore, *River Garden Farms'* assurances that the "fair share" inquiry "will not impart uncertainty" is no longer convincing. (*River Garden Farms, supra,* 26 Cal.App.3d at p. 998.)

Under a pro rata approach, once the court has estimated plaintiff's damages, it need only divide that amount by the number of defendants to determine each defendant's "fair share." The good faith inquiry is rendered much more complex by the added burden of determining the comparative fault of each defendant in order to decide if the settlement is within a "reasonable range" of the tortfeasor's proportionate liability.

The majority rely on *River Garden Farms* for their conclusion that the proportionate liability test of good faith should not "unduly burden the parties or the trial court." (Maj. opn., *ante,* at p. 500.) I disagree. Under the majority's rule, the trial court will have to make a pretrial determination of plaintiff's potential recovery. "[R]elevant to this inquiry are the strengths

of the plaintiff's liability claim and defendant's defenses, the seriousness of the injury . . ., the out-of-pocket expenses incurred by the plaintiff as a result of the injury, whether the case will be tried by a judge or a jury and if by a jury, whether juries from that location are more apt to render high or low verdicts, and a subjective evaluation of the parties, their witnesses and their attorneys. This list is by no means exclusive." (Roberts, *The "Good Faith" Settlement: An Accommodation of Competing Goals, supra,* 17 Loyola L.A. L.Rev. at p. 922.)

In addition, the trial court must determine the comparative fault of the settling tortfeasor with reference to all the parties. "Thus, the court should not look merely to the settlor's liability to the plaintiff, but also to the settlor's liability to his fellow joint tortfeasors under a partial indemnity theory had there been no settlement." (*Id.,* at p. 920.) Finally, in some situations the trial court will have to inquire into the financial condition of the settling defendant. (See maj. opn., *ante,* at p. 499.)

In a complicated case, the time, effort, and expense involved in presenting evidence on all these issues will be considerable. While the trial court has the discretion to determine the good faith issue on the basis of affidavits alone (§ 877.6, subd. (b)), this court cannot predict the percentage of cases in which live testimony will be necessary. The good faith hearings mandated by the majority's decision promise to be lengthy, complex and hotly contested. In my view, they will overburden the courts and severely strain the resources of the parties. (See *Dompeling* v. *Superior Court, supra,* 117 Cal.App.3d at p. 810.)

Moreover, when the majority acknowledge that an overly strict proportionate liability standard would "*unduly* discourage settlements," (maj. opn., *ante,* at p. 499, italics added) they impliedly concede that their rule will discourage settlements to some degree. Both plaintiffs and defendants will be discouraged from settling if faced with the spectre of an expensive and lengthy hearing on the good faith issue.

A defendant who settles gives up his right to contest his liability at trial and forgoes the possibility that a jury will find him completely blameless. If he must nonetheless pay plaintiff an amount "within the reasonable range of [his] proportional share of comparative liability" and defend the settlement amount in a lengthy pretrial proceeding, he may often decide that he has little to gain by settling. (See *Burlington Northern R.R. Co.* v. *Superior Court, supra,* 137 Cal.App.3d at p. 945.)

As the cases and commentators note, settlement is dependent upon the degree to which the settling defendant can be assured of the settlement's

finality. (See *River Garden Farms, supra,* 26 Cal.App.3d at p. 993; comrs. com. to § 4(b) of the Uniform Contribution Among Tortfeasors Act, 12 Uniform Laws Annot. (Master ed. 1975) pp. 99-100; Note, *Settlement in Joint Tort Cases* (1966) 18 Stan.L.Rev. 486, 488-489.) However, the standard propounded by the court in *River Garden Farms* and adopted by the majority here does not promote finality because it is admittedly vague. (See *River Garden Farms, supra,* 26 Cal.App.3d at p. 997.) It will be difficult for a settling defendant to predict whether the trial court will find his settlement to be in good faith. The imprecise nature of the test also produces the added risk that despite the deference paid to the trial court, a favorable good faith determination will be reversed by the appellate court.

Although the majority only briefly mention the policy favoring settlements, it is "[p]erhaps the principal and most often discussed policy relevant to the issue of a 'good faith' settlement . . . ." (Roberts, *The "Good Faith" Settlement: An Accommodation of Competing Goals, supra,* 17 Loyola L.A. L.Rev. at p. 883.) The policy's importance is strongly reflected in section 877, subdivision (b), which releases a settling defendant from the liability claims of *all* parties to the litigation. (*Id.,* at p. 884; *American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d at p. 603.) In *American Motorcycle,* this court stressed the importance of the policy of encouraging settlements and held that section 877 also applied to partial indemnity. (*Id.,* at pp. 603-604.)[3]

Nevertheless, the majority argue that in *American Motorcycle* this court accepted the *River Garden Farms* definition of good faith despite its inhibitory effect on settlements. (See maj. opn., *ante,* at p. 496.) Indeed, the court in *American Motorcycle* cited *River Garden Farms* in holding that section 877 applied to claims for comparative indemnity. (*American Motorcycle, supra,* 20 Cal.3d at p. 604.) However, the court also cited *Stambaugh* v. *Superior Court* (1976) 62 Cal.App.3d 231 [132 Cal.Rptr. 843], which limited *River Garden Farms* to its facts—tortious conduct on the part of a settling party—and held that "a joint tortfeasor should be permitted to negotiate settlement of an adverse claim according to his own best interests, whether for his financial advantage, or for the purchase of peace and quiet, or otherwise. His good faith will not be determined by the proportion his settlement bears to the damages of the claimant." (*Id.,* at p. 238.)

Moreover, with the exception of the recent decision in *Torres* v. *Union Pacific R.R. Co.* (1984) 157 Cal.App.3d 499 [203 Cal.Rptr. 825], no case

---

[3]Several cases decided after *American Motorcycle* have held that the policy favoring settlement is more important than the policy favoring "equitable apportionment of liability among the tortfeasors." (*Sears, Roebuck & Co.* v. *International Harvester Co.* (1978) 82 Cal.App.3d 492, 496-497 [147 Cal.Rptr. 262]; accord *American Bankers Ins. Co.* v. *Avco-Lycoming Division* (1979) 97 Cal.App.3d 732, 736 [159 Cal.Rptr. 70].)

decided since *American Motorcycle* has adopted the rule of *River Garden Farms.* (See, e.g., *Fisher* v. *Superior Court* (1980) 103 Cal.App.3d 434 [163 Cal.Rptr. 47]; *Dompeling* v. *Superior Court, supra,* 117 Cal.App.3d 798; *Burlington Northern R.R. Co.* v. *Superior Court, supra,* 137 Cal.App.3d 942; *Ford Motor Co.* v. *Schultz, supra,* 147 Cal.App.3d 941.)

In sum, neither the decision in *American Motorcycle* nor the legislative history of the good faith clause supports the majority's conclusion that the clause requires a settlement to be "within the reasonable range of the settling tortfeasor's proportional share of comparative liability for plaintiff's injuries." (Maj. opn., *ante,* at p. 499.) Contrary to the majority's assertions, such a rule will unduly discourage settlements and severely burden the trial courts by "convert[ing] the pretrial settlement approval procedure into a full-scale mini-trial." (Maj. opn., *ante,* at p. 499.)

Unlike the Legislature, this court lacks "the facilities and the forum to hear from all interested parties" and determine whether the inequity presented by this case is a common enough occurrence to warrant the decline in settlements and the burden on the legal system that the majority's rule will entail. (*Cardio Systems, Inc.* v. *Superior Court* (1981) 122 Cal.App.3d 880, 891 [176 Cal.Rptr. 254]; see also *Burlington Northern R.R. Co.* v. *Superior Court, supra,* 137 Cal.App.3d at p. 946.)

I would let the Legislature determine whether a departure from the tortious conduct test of good faith is warranted.