ARKWRIGHT MUTUAL INSURANCE COMPANY, as subrogee of Illinois Bell Telephone Company, and Illinois Bell Telephone Company, Plaintiffs,

v.

GARRETT & WEST, INC., and American Telephone and Telegraph Company and AT & T Technologies, Inc., f/k/a Western Electric Company, Inc., Defendants.

GARRETT & WEST, INC.,
Third–Party Plaintiff,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY and AT & T Technologies Inc., f/k/a Western Electric Company, Inc., and Northern Telecom Inc., a Subsidiary of Northern Telecom Ltd., Third–Party Defendants.

No. 90 C 6584.

United States District Court,
N.D. Illinois, E.D.

Dec. 5, 1991.

Terrence R. Joy, Robins, Zelle, Larson & Kaplan, Richard B. Allyn, Robins, Kaplan, Miller & Ciresi, Minneapolis, Minn., Elenie K. Huszagh, Mark Stephen Grotefeld, Lauren Newman, Robins, Kaplan, Miller & Ciresi, Chicago, Ill., for Arkwright Mut. Ins. Co. and Illinois Bell Telephone Co.

Thomas Francis Lucas, Randi Lyn Cigelnik, Peterson & Ross, Chicago, Ill., for Garrett & West, Inc.

Thomas H. Morsch, Sidley & Austin, George A. Platz, Kathleen Lynn Roach, Jared M. Barliant, Sidley & Austin, Thomas R. Phillips, AT & T Corporate Center, Chicago, Ill., for American Tel. & Tel. Corp., AT & T Technologies, Inc. and American Tel. & Tel. Co.

John J. Arado, Edward T. Butt, Jr., James Brian Vogts, Julie Anne Correll, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for Northern Telecom Inc.

MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This suit arises out of the fire that devastated telephone service in the Hinsdale,

Illinois area for several months in 1988. The facts are more fully set forth in this court's earlier opinion in this matter, *Arkwright v. Garrett & West*, 90 C 6584, slip op. (N.D.Ill. May 23, 1991) (*Arkwright I*). Arkwright was Illinois Bell's insurer at the time of the fire and is pressing this action as Bell's subrogee. Arkwright has sued Garrett & West (G & W) and AT & T Technologies (AT & T) for $47 million—the costs it incurred in replacing the equipment damaged in the fire. Arkwright has moved for a finding of good faith in its proposed settlement with AT & T for $5 million. Arkwright has also offered to settle with G & W for $11 million, but that offer has not yet been accepted. G & W opposes the AT & T settlement, claiming that it is not being made in "good faith" as required by the Illinois Contribution Act, Ill.Rev.Stat. ch. 70, par. 302. This court has carefully considered the parties arguments and the documentary evidence they have submitted in support of their respective positions. For the reasons discussed below, it finds the settlement to be in good faith.

### Background

The Hinsdale Central Office is a switching and transmission station for Illinois Bell's telephone service. It contains a large number of various types of cables to effectuate its purpose, which were housed together in "trays" running along the ceiling of the first floor of the HCO. Those trays were, in large part, filled to overflowing with cable. Mixed together in the trays were both armored and DC cables. Armored cable is a group of insulated electrical wires housed in a flexible metal sheath. DC cable is surrounded by insulating material.

Prior to the fire Illinois Bell, through a competitive bidding process in which both AT & T and G & W participated, hired G & W to "mine" obsolete cables from the tray. That is, G & W was to pick out those cables no longer in use and remove them from the cable trays, leaving functional cables intact. G & W performed this task between February and April, 1988. The fire occurred on May 8, 1988.

After the fire the Illinois Commerce Commission and the Office of the State Fire Marshal initiated a joint investigation into the causes and origin of the blaze, and prepared a report detailing their findings (the ICC report or the report). The report cites, as a contributing factor to the fire, the presence of armored and DC cable in the same trays and states that "[t]he significant difference between armored cable and other power cables is that the flexible metal sheath is connected to ground. Since the flexible metal sheath is not insulated, it will conduct electric current when contacted by an energized power cable with sufficiently damaged insulation." ICC Report § 5.2. The ICC listed evidence supporting the inference that some DC cable had become damaged during the G & W cable-mining operation, thus setting the stage for the fire to occur, specifically: Illinois Bell employees witnessed an "arcing" incident while a G & W worker was mining cable in the area where the fire eventually began; after the fire, workers discovered a number of damaged cables, as well as "the unauthorized tool used to create the damage" in the cable trays. *Id.*

The ICC drew the following conclusion regarding the cause and origin of the fire:

The fire was accidental in nature and caused by an electrical fault.

An armored cable contacted a damaged dc power cable.

A dc power cable was most likely damaged at some time during cable mining operations.

\* \* \* \* \* \*

The [HCO] fire of May 8, 1988, was accidental in nature and caused by an electrical fault. A unique combination of circumstances resulted in an electrical fault in the cables of [one of] the cable tray[s].... The initial electrical fault probably involved an armored cable sheath which became energized when it contacted a damaged dc power cable. This contact was caused by cable movement in the trays produced by the combined effects of electrical, mechanical, and thermal forces. The degree of motion was small, but sufficient to result in

contact.... Damage to the dc power cable most likely occurred during cable mining operations ... at sometime prior to the fire. * * *

Contributing causation factors were: the increasing and cyclic ambient and cable temperature variations, building vibrations, and the commercial power interruptions which may have resulted in cable motion. These factors would have had no causal effect if the dc power cable insulation had not been damaged.

Illinois Commerce Commission Report, § 6.2.

However, the ICC also found that:

The presence of armored cables mixed with dc power cables in the cable trays elevated the risk of fire to a serious and unacceptable level. Two factors had to be present to initiate the HCO fire: armored cable and a damaged dc power cable in close proximity in a cable tray. The resistance heating of the grounded sheath of the armored cable was the most probable ignition source of the fire.

*Id.* § 6.5.

Thus, according to the ICC report (upon which all parties rely heavily), the two main causes of the HCO fire were damage to DC power cables and the placement of DC cable in the same cable trays as armored cable. Damage to the DC cables due to cable mining relates to the fire's ignition; damage to the DC power cables due partially to pressure between DC cables and uninsulated parts of the cable trays relates to the fire's spread. G & W would be responsible for the damage caused during cable mining; it claims AT & T is responsible for the pressure damage as well as for the proximate placement of DC and armored cables.

### Discussion

This court's decision regarding the good faith of the proposed settlement is governed by the Illinois Contribution Act, Ill. Rev.Stat. ch. 70, par. 301 et seq. Par. 302(c) provides:

When a release or covenant not to sue ... *is given in good faith* to one or more persons liable in tort arising out of the same injury ... it does not discharge any

of the other tortfeasors from liability for the injury ... unless its terms so provide but it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of consideration actually paid for it, whichever is greater. (Emphasis added).

What exactly constitutes "good faith" and how courts are to go about deciding whether a particular settlement was reached "in good faith" are questions not clearly answered by either the statute (which makes no attempt to define the term) or Illinois cases. Some guiding principles, however, can be discerned from the cases.

Illinois courts have set forth a burden-shifting approach for courts deciding whether a particular settlement agreement was reached in "good faith". The Illinois Supreme Court held in 1989 that:

[I]n determining whether an agreement was made in good faith, all of the surrounding circumstances must be considered.... However, once a preliminary showing of good-faith settlement has been made, the burden shifts to the party challenging the settlement to establish that it was not made in good faith.

*Wilson v. Hoffman Group, Inc.,* 131 Ill.2d 308, 318–18, 137 Ill.Dec. 579, 546 N.E.2d 524 (1989) (Citations omitted). See also *Ruffino v. Hinze,* 181 Ill.App.3d 827, 829–830, 130 Ill.Dec. 542, 537 N.E.2d 871 (1st Dist.1989).

In general, the courts have been instructed to consider the pleadings, discovery materials and affidavits on file as well as the settlement documents. Although they have not precisely defined "good faith", the courts have not required much more than the settling parties' bald statement that the settlement is in good faith to satisfy the initial "preliminary showing" burden.

G & W argues that this court should adopt the California test, which requires the court to consider the settling defendant's potential liability in deciding whether the settlement is actually in good faith. See, for example, *Tech–Bilt, Inc. v. Woodward–Clyde & Associates,* 38 Cal.3d 488,

213 Cal.Rptr. 256, 698 P.2d 159 (1985). The Illinois Supreme Court has at least noted that "[a]n unreasonably low settlement ... results directly in an increase of the non-settling defendant's liability, and consequently the [settlor] is unjustly enriched to the extent that the nonsettling party is forced to satisfy a judgment in excess of the extent of its fault in causing the loss." *Frazer v. A.F. Munsterman, Inc.*, 123 Ill.2d 245, 263, 123 Ill.Dec. 473, 527 N.E.2d 1248 (1988). However, courts have also noted that the eventual determination of the non-settling party's liability is not a fair indication of the settlor's good faith, nor is the fact that a settlement agreement is advantageous to the settlor an indication of bad faith. *McKanna v. Duo-Fast Corp.*, 161 Ill.App.3d 518, 525, 113 Ill.Dec. 348, 515 N.E.2d 157 (1st Dist.1987). The *McKanna* court went on to state that:

> In weighing the apparent disproportionality of a settlement amount in relation to the ad damnum of the complaint, the court must consider both the probable recovery and the possibility of an unexpected result * * * The relationship between the amount of a settlement and the damages sought by the complaint is but one factor for consideration, since damages are often speculative and the probability of liability is frequently uncertain. Accordingly, the amount of a settlement legitimately may be quite different from the amount of damages sought or actually assessed at trial.

*Id.*, (Citations omitted).

This court itself has considered the question whether a proposed settlement was in "good faith" at least twice, first in *In re Johns–Manville*, 1987 WL 11334, 1987 U.S. Dist. Lexis 4215 (N.D.Ill.), and later in *Savic v. United States*, 689 F.Supp. 854 (N.D.Ill.1988). In *Johns–Manville*, the court stated that:

> [T]he Illinois courts have identified three principles to guide determinations of whether settlements are made in good faith: first, because the outcome of litigation is speculative for many different reasons " '[t]he good faith clause should not invalidate a settlement within a reasonable range of the settlor's fair

share,' " *Wasmund v. Metropolitan Sanitary District*, 135 Ill.App.3d 926, 930–31 [90 Ill.Dec. 532, 482 N.E.2d 351] (1st Dist.1985), quoting *River Garden Farms, Inc. v. Superior Court*, 26 Cal. App.3d 986, 997–98 [103 Cal.Rptr. 498] (1972); second, in evaluating a settlement, the judge should draw on his or her personal experience, "since 'good faith or bad faith' is a question of fact in each case," *id.;* and third, "[a]s a matter of public policy the settlement of claims should be encouraged," *Rakowski v. Lucente*, 104 Ill.2d 317, 325 [84 Ill.Dec. 654, 472 N.E.2d 791] (1984).

In *Savic*, the court further noted that:

> The Illinois courts have instructed that although whether a settlement is in good faith is a discretionary question for the trial court, the Illinois public policy favoring "peaceful and voluntary resolutions of claims through settlement agreements" imposes a heavy burden on those seeking to "establish the invalidity of ... [such] agreement[s]." *O'Connor v. Pinto Trucking Service, Inc.*, 149 Ill.App.3d 911, 916 [103 Ill.Dec. 242, 501 N.E.2d 263] (1st Dist.1986); *Wasmund v. Metropolitan Sanitary District*, [supra]; see also *Rakowski v. Lucente*, [supra]. The court should reject the settlement only if the objecting party establishes by clear and convincing evidence that the amount of settlement is so low as to suggest a collusive arrangement unrelated to the lawsuit. See *Doellman v. Warner & Swasey Co.*, 147 Ill.App.3d 842 [101 Ill. Dec. 366, 498 N.E.2d 690] (1st Dist.1986); *O'Connor v. Pinto Trucking Service, Inc.*, [supra]; *Perez v. Espinoza*, 137 Ill. App.3d 762, 766 [92 Ill.Dec. 377, 484 N.E.2d 1232] (1st Dist.1985).

Having thus spelled out the considerations which will govern the determination of whether a settlement is made in good faith, the court must examine the particular settlement in issue here.

As noted above, Arkwright and AT & T propose to settle for $5 million, just slightly more than 10% of the total damages claimed by Arkwright/Illinois Bell. G & W claims that AT & T's potential liability in

this matter is far higher and argues that therefore the settling parties have not met even their preliminary burden of demonstrating that the settlement is in good faith.

■ AT & T and Arkwright have submitted affidavits testifying that they reached the settlement in good faith, and setting forth the reasons why the proposed settlement amount is reasonable. These affidavits, along with the evidence supporting them, suffice to make the preliminary showing of good faith. The court, however, considers also whether the settlement is "within a reasonable range of the settlor's fair share." *Johns–Manville*, supra, citing *Wasmund v. Metropolitan Sanitary District*, 135 Ill.App.3d 926, 930–31, 90 Ill. Dec. 532, 482 N.E.2d 351 (1st Dist.1985).

■ G & W points to a number of factors which it claims tend to demonstrate that AT & T's liability in this matter is quite probably higher than $5 million. First, G & W notes that prior to January 1, 1984, Illinois Bell was part of the AT & T system and all the equipment at HCO prior to that date was supplied exclusively by AT & T. AT & T was also responsible until that date for all modifications, alterations or removals affecting the equipment. Even after divestiture, AT & T supplied a significant amount of equipment and services to HCO. G & W also points to the finding in the ICC report that the presence of armored and DC cable in the same trays was a contributing cause of the fire. It was AT & T, not G & W, which designed the system placing both types of cable in the same tray.

AT & T, on the other hand, offers a number of factors which could serve to mitigate its liability. First, AT & T claims that the practices challenged in the complaint were accepted and approved by Illinois Bell. Indeed, the presence of armored cable in the same trays as DC cable was hardly a "hidden defect". Rather, since Illinois Bell was owned by AT & T at the time the system was established, knowledge of the mechanics of the system would likely be imputed to it. Thus, AT & T argues convincingly that its liability would be mitigated by Illinois Bell's contributory negligence.

The proposition that Illinois Bell was contributorily negligent is supported by other facts cited in the ICC report as well as G & W's memorandum opposing the AT & T/Illinois Bell settlement. Namely, Illinois Bell delayed in reporting the fire; the cable trays in the HCO were overly congested; and there was no readily identifiable method of shutting off power to the HCO. All three of these factors contributed to the spread of the fire and to the amount of destruction it caused.

Next, AT & T points out that whether or not it should have placed armored and DC cable in the same tray, the fire would not have started had not G & W damaged the insulation protecting certain DC cables. This argument too has a basis in Illinois law. See *Ziemba v. Mierzwa*, 142 Ill.2d 42, 153 Ill.Dec. 259, 566 N.E.2d 1365 (1991).

Third, AT & T points out that the system was installed prior to January 1, 1984, the date of divestiture. AT & T therefore claims it is released from tort liability to Illinois Bell by the terms of the Reorganization and Divestiture Agreement which provides that Illinois Bell releases AT & T from "any and all claims ... arising from any events on or prior to the Divestiture Date."

Finally, AT & T cites a provision in each of its contracts with Illinois Bell for work performed after the divestiture date which states that "the liability of Supplier and Purchaser to one another hereunder shall in no event exceed $15 million per occurrence." AT & T maintains that because that provision is contained in a section of the contracts separate from the sections dealing with AT & T's warranties, it limits tort claims as well as contract claims.

The court's task is not, of course, to assess with exactitude the relative liability of the parties but rather to decide whether the proposed $5 million settlement falls within the wide range of "reasonableness" as defined by Illinois law and discussed above. Illinois Bell's claim of $42 million in its complaint is based on the replacement

costs paid by Arkwright in repairing the damage caused by the fire. That amount is not necessarily the relevant amount for assessing the liability of the defendants. Rather, it will be mitigated by a number of factors, most significantly by Illinois Bell's contributory negligence.

In light of the likely existence of such negligence on Illinois Bell's part as well as its release of AT & T from liability for predivestiture events (such as installation of the HCO system) and the strong evidence that G & W's negligence during the cable mining process damaged DC cable, proximately causing the fire, and finally, Illinois Bell's offer to settle with G & W for $11 million, this court finds that G & W has not met its burden of showing even by a preponderance of the evidence, let alone by clear and convincing evidence, that the proposed $5 million settlement with AT & T is in bad faith. Accordingly, the court finds that the proposed $5 million settlement between Arkwright/Illinois Bell and AT & T is in good faith.*

Finally, there is the question whether the settlement should be filed under seal. AT & T has requested that the settlement be sealed and G & W has not objected to that request. The court, however, believes that the public interest will be disserved by preserving the secrecy of the settlement and accordingly will not allow the settlement documents to be filed under seal. The courts are public institutions and their proceedings should be public unless a compelling argument for secrecy can be made. The matters with which this case is concerned are of significant and legitimate public concern. The telephone service of many thousands of citizens was disrupted for a very lengthy period. The public has a right to know of this resolution.

### Conclusion

Arkwright/Illinois Bell's and AT & T's motion for approval of their settlement is

---

* AT & T has agreed to continue to make documents and individuals available for discovery as though it continued to be a party to the suit.

granted. The settlement documents may not be filed under seal.

This court's finding that the proposed settlement is in good faith is premised, in part, upon that representation.