Filed 7/18/22  Failla v. Integrated Practive Solutions CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL FAILLA,<br><br>    Cross-complainant and Appellant,<br><br>    v.<br><br>INTEGRATED PRACTICE SOLUTIONS, INC.,<br><br>    Cross-defendant and Respondent. | D078722<br><br><br>(Super. Ct. No. 37-2018-00063780-CU-FR-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Gordon Rees Scully Mansukhani, Craig J. Mariam, Anthony D. Phillips and Stephanie L. Cobau, for Cross-complainant and Appellant.

Procopio, Cory, Hargreaves & Savitch, Edward C. Walton, Zagros S. Bassirian and Kendra J. Hall, for Cross-defendant and Respondent.

In this action for fraud brought by plaintiff Troy Waymire against Michael Failla, Integrated Practice Solutions, Inc. (IPS), and other defendants, Failla appeals from an order sustaining IPS's demurrer to

Failla's cross-complaint.[1]  Specifically, Failla contends that the trial court erred in ruling that the $50,000 settlement IPS entered into with Waymire was in good faith pursuant to Code of Civil Procedure section 877.6.[2]  The good faith settlement determination subsequently formed the basis for IPS's unopposed demurrer to Failla's cross-complaint, which the trial court sustained with prejudice.

We conclude that Failla has not met his burden on appeal to establish that the trial court abused its discretion in making the good faith settlement determination.  We accordingly affirm the order sustaining the demurrer.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Relevant Parties*

As the issue in this appeal concerns a challenge by Failla to the trial court's good faith determination regarding the settlement between Waymire

---

[1]    Waymire sued two entities known as Integrated Practice Solutions, Inc.:  a dissolved Washington corporation and a currently active Delaware corporation.  Waymire alleged that "Integrated Practice Solutions, Inc. was formed in the State of Delaware on August 6, 2014 — the same day Integrated Practice Solutions, Inc., a Washington corporation became inactive," and that both entities did business as ChiroTouch.  Failla cross-complained against only the active Delaware corporation.  As the distinction between the entities is not material to the issues presented, we refer to the entities, collectively and individually, as IPS.

[2]    Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

2

and IPS, we begin by focusing on those three parties, along with IPS's president and Chief Operating Officer, Robert Moberg.[3]

### 1. *Failla*

Failla was the Chief Executive Officer of Clean Conversion Technologies, Inc. ("CCT") from June 2010 until its dissolution in 2019. As Failla explains, "CCT was a clean energy company that sought to develop and sell industrial technology and machinery capable of extracting recyclable materials from landfill waste, thereby reducing the amount of waste disposed of in landfills." In addition, according to Failla, he owned 47 percent of IPS.

### 2. *Waymire*

In 2012, Waymire invested $250,000 in CCT.[4] When CCT dissolved, Waymire lost the $250,000 that he invested.

### 3. *IPS*

According to Failla's declaration, IPS was involved with CCT in that (1) IPS "provide[d] its interest" in certain necessary equipment to CCT "[i]n or around" 2010; (2) IPS made multiple loans to CCT in 2010 and 2011; and (3) IPS provided some of its employees to assist at CCT, including in fundraising. However, at least some of the evidence submitted by Failla indicates that IPS did not own any shares in CCT.[5]

---

[3]    Our discussion does not rely upon any of the evidence that the trial court excluded in response to Failla's evidentiary objections.

[4]    The complaint does not specify the date of Waymire's investment, although it alleges that discussions between Waymire and Failla material to his investment occurred in 2010. Other documents show that Waymire made his investment in 2012.

[5]    Failla's declaration states that IPS made loans to CCT in exchange for equity in CCT. More specifically, the documents attached to Failla's declaration to support this statement show that IPS made loans to CCT, the

4. *Moberg*

Moberg was IPS's president and chief operating officer. It is undisputed that Moberg was also involved with CCT. According to Failla's declaration, Moberg "prepared financial evaluations pertaining to CCT's future value, and evaluated the worth of CCT's assets. In addition, Mr. Moberg prepared prospectuses and shareholder updates that were distributed to current and prospective shareholders." According to Failla, "Mr. Moberg served as a direct point of contact for shareholders, responded to inquiries from prospective investors, assisted in the preparation of shareholder updates, and personally solicited investments for CCT."

In Moberg's responses to interrogatories, he described his involvement at CCT. "I had a relationship with Michael Failla who was the CEO and Owner of CCT. I was president of [IPS], a company Failla had significant ownership in, and I ran the day to day operations of that organization. I was not an agent of, a board member to, or employee of CCT and I had no official capacity with CCT." Moberg explained that with respect to his involvement at CCT, "I was acting in an advisory position to [Failla] on issues [Failla] needed assistance on, but [Failla] was the sole owner and sole officer of CCT."

Moreover, as Failla explained in his deposition testimony, Moberg participated in CCT mainly on his own behalf, rather than on behalf of IPS. Specifically, Failla agreed that instead of representing IPS, Moberg was

terms of which *permitted* IPS to convert loan indebtedness to equity shares in CCT in the event of nonpayment. A *partially executed* document dated June 30, 2011, states that IPS "is not considering converting any portion of this . . . amount to equity within CCT and is expecting repayment." An *unexecuted* loan agreement dated February 13, 2012, states that in consideration of a short-term loan of $200,000 from IPS to CCT, "IPS will be rewarded an additional 2% of the company[,] resulting in 10%." Moberg testified in his deposition that IPS never obtained any equity interest in CCT.

"wearing a different hat" when he was helping CCT. Failla stated that at CCT, Moberg "was mostly working on his own as an independent interested person and not working for [IPS]" when advising CCT's board. Failla stated in his declaration in this action that when Moberg was acting on behalf of IPS, he would use his "mychirotouch.com" e-mail account from IPS, and that when Moberg was acting individually he would use a personal e-mail account. Some e-mail messages in the record were sent from Moberg from his IPS e-mail address.

There is no evidence that Moberg had any communication with Waymire, either on behalf of himself or on behalf of IPS. There is also no evidence that Moberg assisted Failla in his communications with Waymire or reached any agreement with Failla about the representations he would make to Waymire. Moberg stated in responses to interrogatories, "I do not remember having any connection or discussion directly with Mr. Waymire. I do not recall having ever provided any documents to Mr. Waymire." Failla submitted an e-mail showing that Moberg, along with others, was informed *after the fact* about Waymire's investment. Further, Waymire stated during his deposition that the only thing he knew about Moberg was that "he was a person that . . . Failla wanted me to meet," and Failla "thought he was a key player."

B.    *Waymire's Complaint*

On December 19, 2018, Waymire filed a complaint which named Failla, Moberg, CCT, and IPS as defendants. Against Failla and CCT, the complaint alleged "Fraud – Intentional Misrepresentation" and "Fraud – Concealment." (Capitalization and bolding omitted.) Against Moberg and IPS, the complaint alleged "Conspiracy to Commit Fraud" and "Aiding and Abetting Fraud." (Capitalization and bolding omitted.)

5

The complaint alleged that Failla, on behalf of himself and CCT, made false statements to Waymire, including: (a) CCT owned certain equipment and a patent license; (b) certain individuals were part of the CCT management team; (c) Failla, along with those individuals, would collectively own the majority of CCT; (d) the value of CCT's assets was $7.5 million; and (e) CCT would generate a multi-million dollar pre-tax annual cash flow. According to the complaint, the statements made by Failla to induce Waymire to invest were materially false because: (1) CCT had obtained its intellectual property license and equipment by means of a "fraudulent scheme" that was the subject of a pending lawsuit; (2) Failla and Moberg were presently engaged in a plan to oust the individuals whom Failla represented were part of the CCT management team; and (3) "the company had no legitimate business plan or ability to generate a multi-million annual dollar cashflow, or anything close to it." The complaint also alleged that Failla concealed the fact that "all of CCT's assets were tainted and without clear title," and "that there were significant legitimate business risks CCT would face as a going concern."

Both the conspiracy and the aiding and abetting causes of action against Moberg and IPS were alleged in a general manner, and did not identify any specific actions by either party. The complaint alleged that "[b]eginning in 2010, . . . Moberg and [IPS] banded together and conspired with Failla and CCT to defraud investors, including Troy Waymire, by making untrue statements of material fact to Waymire." According to the complaint, Failla and CCT were "the more active members of the group" in that they communicated with Waymire. The conspiracy cause of action alleged in a conclusory manner that "Moberg and [IPS] cooperated with Failla and CCT in enabling them to make the misrepresentations and

6

omissions." The aiding and abetting cause of action alleged in a conclusory manner that "Moberg and [IPS] gave Failla and CCT substantial assistance and encouragement to make the misrepresentations and omissions."

The four causes of action each contained an allegation that Waymire suffered damages in an amount to be determined at trial, "but not less than $250,000" or "in no event less than $250,000.00." These allegations were based on the fact that Waymire sold his residence and used the proceeds to make a $250,000 investment in CCT, which he lost when CCT ceased operations. The prayer for relief at the end of the complaint sought both compensatory and punitive damages but did not specify any amounts.

Waymire dismissed CCT from the action without prejudice in April 2019.

C.   *The Good Faith Settlement Determination*

On July 16, 2020, IPS filed an application for a good faith settlement determination for a settlement between IPS and Waymire. (§ 877.6, subd. (a)(2).) The application explained that IPS paid Waymire $50,000 in exchange for a dismissal with prejudice and a mutual release. The settlement agreement was attached to a declaration in support of the application.

On July 22, 2020, Failla filed a cross-complaint for equitable indemnification, contribution, apportionment of fault, and declaratory relief against IPS, Moberg and three other individuals, in which he sought to recover from those parties for any liability he incurred to Waymire.

On August 10, 2020, Failla filed a motion to contest the good faith settlement between IPS and Waymire. Among other things, Failla contended that the settlement was not within the reasonable range of IPS's proportional share of liability because discovery revealed: (1) "that IPS actively managed

7

CCT, including its solicitation of prospective investors," supporting liability under theories of conspiracy or aiding and abetting; and (2) that "Mr. Waymire seeks punitive and compensatory damages that total $2,750,000.00." Therefore, according to Failla, "IPS'[s] settlement represents less than two percent of Mr. Waymire's requested relief" and "would leave Dr. Failla solely liable for a potential judgment in excess of $2,700,000."

To support his argument, Failla relied on evidence that was attached to his and counsel's declarations. The evidence falls into two main categories. The first category of documents included letters, e-mails, debt notes, a memorandum of terms, and promotional materials created by CCT. Failla relied on that evidence to argue that IPS actively managed CCT and participated in soliciting investors.

The second category of evidence was used by Failla to support his contention that Waymire sought to recover $2.75 million in the litigation. That evidence included Waymire's responses to Failla's Special Interrogatories (Set One), dated June 12, 2020, which stated: "[Waymire] seeks $550,000 in compensatory damages, computed by the loss on [his] sale of his [home] (approximately $300,000) combined with the loss of his investment in CCT ($250,000). [Waymire] seeks $2,200,000 in punitive damages, computed by using a 4x multiple of the compensatory damages sought." The evidence also included: (1) documents produced by Waymire in May 2020 regarding the sale of his home;[6] and (2) excerpts from Waymire's February 20, 2020 deposition in which he explained that in addition to losing the $250,000 he invested in CCT, he lost an additional $300,000 by selling his

---

[6] Failla incorrectly states in his appellate brief that Waymire produced these documents on February 13, 2020. Counsel's declaration authenticating the documents states that they were produced on May 4, 2020.

house in an unfavorable housing market in order to obtain the funds for the investment.

In its opposition to Failla's motion contesting the good faith settlement, IPS argued that at the time it reached a settlement with Waymire on February 19, 2020, Waymire had identified $250,000 as the amount he sought to recover in the litigation, and that the settlement of $50,000 was 20 percent of that amount. IPS also argued that there was a lack of any substantial evidence linking IPS to the alleged wrongdoing, and that Waymire's case against it was weak because of defenses based on the statute of limitations and the provisions of the stock purchase agreement signed by Waymire. To support IPS's argument, counsel filed a declaration attaching excerpts from Failla's, Moberg's and Waymire's depositions and from Moberg's responses to Waymire's special interrogatories. Counsel's declaration also explained that the settlement between IPS and Waymire was reached on February 19, 2020, the day prior to Waymire's February 20, 2020 deposition, and it attached e-mails documenting the negotiations on that day.

On September 18, 2020, Failla filed a reply memorandum. The declaration in support of the reply attached several deposition excerpts, including some of the deposition excerpts that had already been submitted by IPS.

Failla filed evidentiary objections to almost all of the evidence that IPS submitted in support of its opposition memorandum, on the ground, among others, that it was not authenticated because IPS failed to attach a court reporter's certificate or an authentication by the attorney who took the depositions. IPS filed evidentiary objections to some of Failla's evidence.

On September 22, 2020, the trial court issued a tentative ruling denying Failla's motion contesting the good faith settlement. The tentative

ruling stated that the trial court would sustain all of Failla's evidentiary objections, based on lack of authentication. (Evid. Code, § 1401.) Specifically, as to IPS's evidence, this left only Exhibits N, O, P, and Y that were not excluded, as they were not the subject of Failla's evidentiary objections. Those documents consisted of excerpts from Moberg's responses to Waymire's special interrogatories (Exhibit N), e-mails between counsel showing that Waymire and IPS reached a settlement on February 19, 2020 (Exhibits O and P), and excerpts from IPS's responses to form interrogatories, showing lack of insurance coverage (Exhibit Y).[7]

A hearing on Failla's motion was held September 25, 2020. As relevant here, counsel for Failla argued: "The tentative appeared to rely heavily on IPS's evidence for the proposition that Mr. Moberg was operating on behalf of himself. However, we note[ ] that the tentative actually excluded all of IPS's relevant evidence due to lack of authentication. So once excluded, IPS's argument is actually without support and Dr. Failla's declaration stands unchallenged, leaving no alternative but a finding that Mr. Moberg was operating on behalf of IPS when he used and sent emails from the IPS email address."

In response, counsel for IPS pointed out that regardless of the trial court's exclusion of most of IPS's evidence, there was still no evidence before the court suggesting that Moberg or IPS made any false statements as part of a scheme to induce investments in CCT, or to Waymire specifically. Counsel for IPS also pointed out that even though the excerpts from Failla's

---

7    As to IPS's objections to Failla's evidence, the trial court overruled all of them except the objections to Exhibits 3 through 5, which it sustained based on hearsay. Exhibits 3 through 5 are CCT corporate documents that Failla's declaration described as "discuss[ing] Mr. Moberg's leadership role within CCT."

10

deposition that IPS submitted were excluded by the trial court, Failla submitted the same excerpts in connection with his reply memorandum. The trial court focused on this argument and stated to counsel for Failla, "so even if I were to sustain the objections to . . . IPS's papers, your side has put the same or substantially similar information before the court. So we're back to where we started, I think." The court stated that it would "continue to sustain the objection to [the evidence presented by] IPS's counsel" but having reviewed the evidence, it was "satisfied that there is enough evidence to support the positions advocated by IPS" and it would confirm its tentative ruling.

The trial court's September 25, 2020 written ruling, issued after the hearing, determined that the settlement between Waymire and IPS was in good faith. The trial court provided the following explanation:

> "The settlement reached on February 19, 2020 in the amount of $50,000 represents 20% of the total claimed compensatory damages. Although discovery responses served in June 2020 attempts to claim a higher amount in compensatory damages, the settlement amount is within the 'ballpark' of the total, proportionate liability of the IPS entities as of the date the settlement was reached. No evidence is presented demonstrating a likelihood that [Waymire] will obtain any award for punitive damages as against the IPS entities.

> "The evidence submitted with the moving papers tends to demonstrate that Robert Moberg was involved promoting and managing CCT. He utilized his 'mychirotouch.com' email for these purposes. However, other than use of this email, there is little evidence that he was acting as an agent for the IPS entities when he was working on behalf of CCT. In contrast, the evidence submitted with the opposition tends to demonstrate that Moberg was 'wearing a different hat' and working on his own behalf. In addition, although there is evidence that IPS was an investor, the evidence submitted with the moving papers does not demonstrate that false statements were made by the IPS entities as part of a

11

scheme to induce investments in CCT. There is no evidence that Moberg communicated with [Waymire]. Finally, the timing of the settlement is not indicative of fraud or collusion in the settlement process."

In its written ruling, the trial court also confirmed that, as in the tentative ruling, it had sustained all of Failla's evidentiary objections.

On October 15, 2020, Failla filed a petition for writ of mandate challenging the trial court's good faith settlement determination. We summarily denied the petition on October 26, 2020.

D.    *The Order Sustaining IPS's Demurrer to Failla's Cross-Complaint*

On January 15, 2021, the trial court sustained an unopposed demurrer filed by IPS to Failla's cross-complaint. The ruling was premised solely on the good faith settlement determination. The trial court's order sustaining the demurrer with prejudice stated that the order "completely dispose[d] of the Cross-Complaint as against Cross-Defendant IPS."

Failla appeals from the order sustaining the demurrer.[8] More specifically, he challenges the trial court's good faith settlement determination.[9]

---

[8]    On July 22, 2021, we denied IPS's motion to dismiss the appeal, in which IPS argued that the order sustaining the demurrer with prejudice was not an appealable order.

[9]    On January 4, 2022, IPS filed a motion to augment the record on appeal. On January 24, 2022, we partially granted the motion with respect to the documents filed in the trial court on October 19, 2020, and otherwise denied it. On January 24, 2022, Failla filed a motion to augment the record on appeal. We construed the motion as a partial motion to reconsider our order on IPS's motion to augment, and we ordered that the motion to reconsider would be considered concurrently with the appeal. We hereby deny the motion to reconsider. The document at issue is an order filed by the

12

II.

DISCUSSION

A. *Applicable Legal Standards*

We begin our analysis of Failla's challenge to the good faith settlement determination by reviewing the applicable legal standards.

The procedure for a good faith settlement determination is set forth in section 877.6, subdivision (a)(2). In an action in which it is alleged that two or more parties are joint tortfeasors or co-obligors on a contract debt, "a settling party may give notice of settlement to all parties and to the court, together with an application for determination of good faith settlement and a proposed order." (§ 877.6, subd. (a)(2).) After such an application is made, "a nonsettling party may file a notice of motion to contest the good faith of the settlement." (*Ibid.*)

"The party asserting the lack of good faith shall have the burden of proof on that issue." (§ 877.6, subd. (d).) Specifically, "[o]nce there is a showing made by the settlor of the settlement, the burden of proof on the issue of good faith shifts to the non-settlor who asserts that the settlement

_____

trial court on March 24, 2021, which is after the notice of appeal was filed on March 16, 2021, and many months after the trial court's September 25, 2020 good faith settlement determination. Absent extraordinary circumstances, an appellate court " 'will consider only matters which were part of the record at the time the judgment was entered.' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) No extraordinary circumstances are present here because the order postdates the trial court's September 25, 2020 good faith settlement determination and thus is not relevant to our determination of whether the trial court abused its discretion. In reviewing an order determining a settlement to be in good faith, "we rely upon the state of the record, and the respective showings made by the parties, as of the time of the motion." (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 878, fn. 9 (*Toyota Motor Sales*).)

13

was not made in good faith. [Citation.] If contested, declarations by the non-settlor should be filed which in many cases *could* require the moving party to file responsive counterdeclarations to negate the lack of good faith asserted by the non-settling contesting party." (*City of Grand Terrace v. Superior Court* (1987) 192 Cal.App.3d 1251, 1261-1262 (*City of Grand Terrace*), italics added.) "[T]he trial court's consideration of the settlement agreement and its relationship to the entire litigation in a contested setting must proceed upon a sufficient evidentiary basis to enable the court to consider and evaluate the various aspects of the settlement." (*Id.* at p. 1263.)

A good faith determination bars "any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." (§ 877.6, subd. (c).) "A good faith settlement determination also reduces the claims against the nonsettling defendants in the amount stipulated by the settlement. (§ 877, subd. (a).)" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 959 (*Cahill*).)

In *Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 (*Tech-Bilt*), our Supreme Court explained that in making a good faith settlement determination, a trial court should "inquire, among other things, whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." (*Id.* at p. 499.) *Tech-Bilt* explained, "the intent and policies underlying section 877.6 require that a number of factors be taken into account" in making this inquiry, "including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs,

14

and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants. [Citation.] Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement. '[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be.' " (*Tech-Bilt,* at p. 499.) "When evaluating whether the parties reached a settlement in good faith, a trial court must examine not only the settling tortfeasor's potential liability to the plaintiff, but also the settling tortfeasor's potential liability to all nonsettling tortfeasors." (*PacifiCare of California v. Bright Medical Associates, Inc.* (2011) 198 Cal.App.4th 1451, 1465 (*PacifiCare*).) "[A] court not only looks at the alleged tortfeasor's potential liability to the plaintiff, but it must also consider the culpability of the tortfeasor vis-à-vis other parties alleged to be responsible for the same injury." (*TSI Seismic Tenant Space, Inc. v. Superior Court* (2007) 149 Cal.App.4th 159, 166.)

A party contesting the good faith of a settlement must "demonstrate . . . that the settlement is so far 'out of the ballpark' in relation to" the factors identified by our Supreme Court "as to be inconsistent with the equitable objectives of the statute." (*Tech-Bilt, supra,* 38 Cal.3d at pp. 499-500.) " '[A] "good faith" settlement does not call for perfect or even nearly perfect apportionment of liability. In order to encourage settlement, it is quite proper for a settling defendant to pay less than his proportionate share of the anticipated damages. What is required is simply that the settlement not be

grossly disproportionate to the settlor's fair share.' " (*PacifiCare, supra,* 198 Cal.App.4th at p. 1465.) "[E]ach case must be decided based on its particular circumstances and the trial court may consider its own judicial experience . . . ." (*Cahill, supra,* 194 Cal.App.4th at p. 968.)

"In the context of section 877.6, '[t]he trial court is given broad discretion in deciding whether a settlement is in "good faith" for purposes of section 877.6, and its decision may be reversed only upon a showing of abuse of discretion.' " (*Cahill, supra,* 194 Cal.App.4th at p. 957.) "[T]here is no abuse of discretion requiring reversal if there exists a reasonable or fairly debatable justification under the law for the trial court's decision or, alternatively stated, if that decision falls within the permissible range of options set by the applicable legal criteria." (*Ibid.*) " 'On appellate review, a trial court's determination of good faith of a settlement involving the resolution of factual issues will be upheld if supported by substantial evidence.' " (*Dole Food Co., Inc. v. Superior Court* (2015) 242 Cal.App.4th 894, 909.) "If . . . there is no substantial evidence to support a critical assumption as to the nature and extent of a settling defendant's liability, then a determination of good faith based upon such assumption is an abuse of discretion." (*Toyota Motor Sales, supra,* 220 Cal.App.3d at p. 871.)[10]

B.     *The Date of the Settlement*

We first consider Failla's contention that the trial court's good faith settlement determination was flawed because it relied on the finding that the

---

[10]     Failla relies on the principle that "where the facts are undisputed, the issue is one of law and the appellate court is free to reach its own legal conclusion from such facts," to argue that we should apply a de novo standard of review. (*Toyota Motor Sales, supra,* 220 Cal.App.3d at p. 872.) We reject the argument. Although the trial court sustained objections to much of IPS's evidence, the facts underlying this litigation are still in dispute.

parties reached a settlement on February 19, 2020, rather than on March 9, 2020, when the written settlement agreement was fully executed.

As our Supreme Court has explained, "practical considerations obviously require that the evaluation [of good faith] be made on the basis of information available *at the time of settlement*." (*Tech-Bilt, supra,* 38 Cal.3d at p. 499, italics added, citing *Torres v. Union Pacific Railroad Co.* (1984) 157 Cal.App.3d 499, 509 (*Torres*).) This rule exists "[i]n order to promote the finality of settlements." (*Torres,* at p. 509.)

In its ruling, the trial court explained "[t]he settlement reached on February 19, 2020[,] in the amount of $50,000 represents 20% of the total claimed compensatory damages. Although discovery responses served in June 2020 attempt[ ] to claim a higher amount in compensatory damages, the settlement amount is within the 'ballpark' of the total, proportionate liability of the IPS entities as of the date the settlement was reached."

Failla contends that the trial court should have identified March 9, 2020 as the date of the settlement. To support this argument, Failla relies upon the written settlement agreement between IPS and Waymire. The settlement agreement stated: "1. <u>Effective Date</u>. This Agreement shall be deemed effective on the date the last Party signs this Agreement . . . ." The settlement agreement was signed by Waymire on February 22, 2020, and by IPS on March 9, 2020. Therefore, Failla contends the settlement was reached on March 9, 2020.

According to Failla, if the date of settlement is March 9, 2020, the trial court's good faith settlement determination should have taken into account Waymire's statement at his February 20, 2020 deposition, in which he indicated for the first time that he may be seeking an additional $300,000 in compensatory damages. Specifically, on that date, Waymire testified that he

17

sold his home in order to invest in CCT, and that in doing so he lost $300,000 by selling in an unfavorable real estate market.[11] Failla contends that $50,000 is not within the reasonable range of IPS's proportional share of comparative liability for Waymire's damages when the additional $300,000 in compensatory damages are added to the $250,000 sought by Waymire for his lost investment, bringing the total of compensatory damages sought by Waymire to $550,000.

We reject Failla's argument because we conclude that substantial evidence supports the trial court's finding that a settlement was reached between Waymire and IPS on February 19, 2020. Specifically, IPS submitted e-mail correspondence between counsel that documented February 19, 2020, as the date on which the parties agreed to the terms of their settlement. Further, documents in the record clearly show that because IPS and Waymire reached a settlement on February 19, 2020, counsel for IPS did not attend Waymire's February 20, 2020 deposition, at which Waymire for the first time identified a factual basis for his eventual claim to be seeking an additional $300,000 in compensatory damages. Although the parties' February 19, 2020 agreement was subsequently documented in a written settlement agreement, under which the "Effective Date" was March 9, 2020, a review of the settlement agreement shows that the "Effective Date" serves a specific legal purpose. Specifically, the "Effective Date" determines the

_____

[11]   Waymire testified, "So I strictly sold the house early to invest in [Failla's] business. And even in two years I would have lost at least [$]300,000. It was a substantial loss to have sold at that time." However, Waymire did not formally identify that he was seeking an additional $300,000 in compensatory damages until his June 2020 discovery responses, which were served several months after IPS and Waymire entered into their settlement.

18

beginning of the 15-day deadline for IPS to pay Waymire $50,000, which in turn determines when the five-day period begins for Waymire to file a dismissal with prejudice. Although the date of March 9, 2020, has significance for those legal issues, it is nevertheless consistent with the evidence in the record for the trial court to have found that the parties reached a settlement on February 19, 2020, which was subsequently documented in a formal agreement.

Further, it is consistent with the policy in favor of promoting the finality of settlements (*Torres*, *supra*, 157 Cal.App.3d at p. 509) for the trial court to have based its good faith settlement analysis on the date the parties *first* came to terms on their settlement. If a trial court making a good faith settlement determination was required to consider litigation developments occurring *after* the parties concluded their settlement negotiations, parties would be encouraged to *continue* to evaluate the advisability of a settlement, even *after* they come to a final agreement. The policy in favor of the finality of settlements counsels against such an approach.

In sum, we find no basis to conclude that the trial court erred in finding that the parties reached a settlement on February 19, 2020.

In challenging the trial court's use of $250,000 as the compensatory damages figure identified by Waymire at the time of the settlement, Failla also points to the fact that in June 2020, Waymire stated in discovery responses that he was seeking punitive damages in the amount of $2.2 million. However, that figure is not relevant to the good faith settlement determination for two reasons. First, Waymire initially identified that figure several months *after* he entered into a settlement with IPS. Second, the trial court found that "[n]o evidence [was] presented" by Failla "demonstrating a likelihood that [Waymire] will obtain any award for punitive damages as

19

against the IPS entities." We agree with the trial court's assessment regarding punitive damages. Failla failed to present any argument or evidence showing that IPS might be found liable for punitive damages. Therefore, the trial court properly omitted the $2.2 million in punitive damages when conducting its good faith settlement analysis.

C. *Admissible Evidence Supports the Trial Court's Good Faith Settlement Determination*

Failla next argues that because the trial court sustained his evidentiary objections to much of IPS's evidence, the record stands *uncontradicted* and establishes IPS's likely liability to Waymire on a theory of conspiracy or aiding and abetting. Specifically, Failla argues, "IPS'[s] failure to present admissible and relevant evidence results in Dr. Failla's admissible evidence standing unchallenged, and leaves no reasonable conclusion except that IPS is liable on a theory of derivative liability." (Italics omitted.)

To assess this argument, we begin by focusing on the factual findings that the trial court made to support its good faith settlement determination. First, the trial court stated that although Moberg was active at CCT, "there is little evidence that [Moberg] was acting as an agent for the IPS entities when he was working on behalf of CCT. In contrast, the evidence submitted with the opposition tends to demonstrate that Moberg was 'wearing a different hat' and working on his own behalf." Second, the trial court stated, "[A]lthough there is evidence that IPS was an investor, the evidence submitted with the moving papers does not demonstrate that false statements were made by the IPS entities as part of a scheme to induce investments in CCT. There is no evidence that Moberg communicated with [Waymire]." As we will explain, the trial court's findings are supported by

20

the evidence, even in light of the trial court's order sustaining Failla's objections to IPS's evidence.

First, the evidence before the trial court supported the trial court's finding that Moberg "was 'wearing a different hat' and working on his own behalf," at CCT, rather than on behalf of IPS. Specifically, in support of his reply memorandum, Failla submitted an excerpt from his deposition, in which he (1) testified that Moberg participated in CCT mainly on his *own* behalf, rather than on behalf of IPS; and (2) agreed that instead of representing IPS, Moberg was "wearing a different hat" when he was helping CCT. The *identical* excerpt from Failla's deposition was submitted by IPS and was excluded by the trial court as a result of Failla's evidentiary objection. However, the excerpt was before the trial court when it made its good faith settlement determination because it was independently submitted by Failla. The trial court properly relied on that evidence in making its ruling.

Second, the record supports the trial court's finding that there was no evidence of any "false statements . . . made by the IPS entities as part of a scheme to induce investments in CCT," and more specifically, that even if Moberg was acting on behalf of IPS at CCT, "[t]here is no evidence that Moberg communicated with [Waymire]." In his responses to special interrogatories, Moberg stated that he did not remember "having any connection or discussion directly with Mr. Waymire" or "having ever provided any documents to Mr. Waymire."[12] Similarly, in an excerpt from Waymire's

_____

[12] Failla contends that we should not consider Moberg's responses to the special interrogatories because Moberg was responding on behalf of himself, not on behalf of IPS. We reject the argument. Moberg's verified responses are admissible evidence, regardless of the capacity in which he made them.

21

deposition, Waymire did not describe any interaction with Moberg. Instead, Waymire stated that his only information about Moberg was that Failla wanted him to meet Moberg and that Failla described him as a "key player."

Based on this evidence, despite the trial court's order sustaining Failla's evidentiary objections, the record contained "a sufficient evidentiary basis to enable the court to consider and evaluate the various aspects of the settlement." (*City of Grand Terrace, supra,* 192 Cal.App.3d at p. 1263.) The trial court's factual findings, based on that evidence, served as the basis for its ruling. Because of the substantial evidence in the record supporting the trial court's findings, this case is not comparable to *Mattco Forge, Inc. v. Arthur Young & Co.* (1995) 38 Cal.App.4th 1337, cited by Failla, in which the record before the trial court was devoid of *any* evidentiary support, and contained only "a series of questionable assumptions" set forth in a memorandum of points and authorities. (*Id*. at p. 1350.)

D.     *Based on Substantial Evidence in the Record, the Trial Court Was Within Its Discretion to Determine That $50,000 Was Not Grossly Disproportionate to IPS's Fair Share Based on a Theory of Derivative Liability*

Finally, we evaluate Failla's contention that the trial court abused its discretion in making the good faith settlement determination because the evidence shows that IPS played a role at CCT that would make it liable under a theory of derivative liability even though it did not make any direct representations to Waymire.

As a first step in analyzing this argument, we examine the evidentiary showing that would be required for Waymire to succeed on the theories of derivative liability that he asserted against IPS. With respect to the claim that IPS conspired with Failla or CCT to commit fraud, Waymire would have to show "that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that

22

one or more of them committed an overt act to further it. [Citation.] It is not enough that the conspiring [parties] knew of an intended wrongful act, they must agree—expressly or tacitly—to achieve it." (*Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 333 (*Choate*).) "Because civil conspiracy is so easy to allege, plaintiffs have a weighty burden to prove it." (*Ibid*.) With respect to the claim that IPS aided and abetted a fraud by Failla or CCT, Waymire would have to show that IPS " ' " 'kn[ew] the other's [i.e., Failla's and CCT's] conduct constitute[d] a breach of duty and g[a]ve[ ] substantial assistance or encouragement to the other to so act.' " ' " (*Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 343 (*Nasrawi*).)

Failla points to evidence that, according to him, is sufficient to establish derivative liability under either a conspiracy or aiding and abetting theory. As we will explain, the evidence upon which Failla relies does not suggest that IPS has derivative liability for any fraud perpetrated by Failla or CCT against Waymire.

Failla first relies on evidence that IPS made loans to CCT that were "only to be repaid upon CCT achieving its 'desired funding.' " As we understand Failla's argument, this arrangement gave IPS an incentive to actively participate in a fraudulent scheme to raise funds for CCT. Failla argues that derivative liability "may be inferred through IPS'[s] interest in and relationship with CCT." For two reasons, we are not persuaded that this evidence supports derivative liability for fraud against IPS. First, Failla does not accurately describe the terms of IPS's loans to CCT. The documents attached to Failla's declaration show that IPS made loans to CCT that were payable in full as soon as CCT achieved a certain level of funding, *but* if that did *not* occur, CCT *remained* obligated to IPS. That obligation would be satisfied at a specified date by either immediate repayment, converting the

23

loan to a note payable in installments, or issuance of equity shares in CCT to IPS. Thus, it is not true that IPS was "*only* to be repaid upon CCT achieving its 'desired funding.' " (Italics added.) Second, the mere fact that IPS had a financial stake in CCT's success does not suggest any actual participation in a conspiracy or the provision of substantial assistance in a scheme by Failla and CCT to defraud Waymire.

Failla next contends that "IPS assumed an active role in CCT and even assigned its own personnel to assist with CCT's fundraising efforts." In support, Failla focuses on an e-mail showing that in May 2011, a person named "Joyce" was paid by IPS to work with CCT to assist with fundraising efforts. Specifically, in a May 23, 2011 e-mail to Failla, Moberg stated, "I have had a conversation with Joyce. [IPS] will continue to pay for Joyce through June. I feel Joyce will do a great job getting these communications managed, follow-up with, [*sic*] and lists pulled together. She will be able to provide value well beyond June, but the need right now—MONEY. She has the tenacity and capacity to have those conversations and will actually do much better with prospects. I explained to her what was expected, she will need some follow-up, but she WILL keep us connected to and results understood from that list of potential investors. [¶] . . . [S]he can help get new emails and invitations distributed." Although this e-mail shows that Moberg, on at least one occasion, authorized IPS to pay an employee to work on CCT's fundraising, that fact, in itself does not suggest that IPS either conspired with or aided and abetted Failla's or CCT's fraud. Failla presented no evidence to support a finding that "Joyce" was involved in the representations that Failla made to Waymire, or that, on behalf of IPS, she entered into a conspiracy or aided and abetted a scheme to defraud Waymire.

24

Finally, Failla relies on evidence of Moberg's investor solicitation activities at CCT, which he contends were undertaken on behalf of IPS. However, as we have discussed, the record contains substantial evidence to support a finding that Moberg was acting on his *own* behalf, not on behalf of IPS, when he was involved at CCT. Failla indicated during his deposition that instead of representing IPS, Moberg was "wearing a different hat" when he was helping CCT, and that at CCT, Moberg "was mostly working on his own as an independent interested person and not working for [IPS]" when he advised CCT's board. Although Failla stated in his declaration that Moberg used his IPS e-mail address when he was working on behalf of IPS, and his personal e-mail address when he was not, the trial court was not required to credit Failla's statement, which was not corroborated by any other witness. Further, even assuming Moberg was acting on behalf of IPS when he was involved at CCT, Failla submitted no evidence to suggest that Moberg agreed to participate in a conspiracy to defraud Waymire or that he provided substantial assistance or encouragement to any such fraudulent scheme. Although there is evidence that Moberg was active at CCT, there is no evidence that he was involved in a scheme to defraud Waymire.

In sum, Failla fails to identify any evidence to suggest—as required to establish civil conspiracy—that IPS and either Failla or CCT "acted in concert and came to a mutual understanding to accomplish a common and unlawful plan" (*Choate, supra,* 86 Cal.App.4th at p. 333) to defraud Waymire. Further, Failla presented no evidence to suggest—as required for aiding and abetting liability—that IPS knew about a scheme to defraud Waymire and gave Failla or CCT " ' " 'substantial assistance or encouragement to . . . so act.' " ' " (*Nasrawi, supra,* 231 Cal.App.4th at p. 343.) Thus, Failla did not establish that Waymire would likely recover against IPS either as a

25

coconspirator or as an aider and abettor of the fraud allegedly perpetrated by Failla and CCT.

Based on Failla's failure to demonstrate IPS's likely liability under either a conspiracy or aiding and abetting theory, the trial court could reasonably conclude, based on the record, that a settlement of $50,000 was within the reasonable range of IPS's proportionate liability for a case in which, at the time of settlement, Waymire identified "not less than $250,000" as the amount of compensatory damages at issue. In a case with two remaining active defendants,[13] a settlement of 20 percent of Waymire's identified damages at the time of settlement was not " 'grossly disproportionate to [IPS's] fair share' " (*PacifiCare, supra,* 198 Cal.App.4th at p. 1465), especially when Failla failed to present evidence suggesting IPS's derivative liability. Moreover, in making its good faith determination, the trial court properly recognized that "a settlor should pay less in settlement than if found liable after a trial." (See *Tech-Bilt*, *supra*, 38 Cal.3d at p. 499 [describing "a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial."].)

The trial court accordingly did not abuse its discretion in making the good faith settlement determination, and it properly relied on that determination in sustaining IPS's unopposed demurrer to Failla's cross-complaint.

---

13    At the time of IPS's settlement, both Failla and Moberg remained as active defendants.

## DISPOSITION

The order sustaining IPS's demurrer to Failla's cross-complaint with prejudice is affirmed.

IRION, J.

WE CONCUR:

AARON, Acting P. J.

DATO, J.